IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN FIORE | : | CIVIL ACTION |
| v. | : | No. 09-4247 |
| CITY OF BETHLEHEM, et al. | : | |

**MEMORANDUM**

Juan R. Sánchez, J.                                     March 30, 2011

Plaintiff John Fiore brings claims against the City of Bethlehem and 14 Bethlehem officials and employees,[1] pursuant to 42 U.S.C. § 1983 and Pennsylvania law, relating to his arrest on domestic violence charges. Defendants seek summary judgment in their favor on Mr. Fiore's § 1983 claims for malicious prosecution, false arrest, false imprisonment, illegal search and seizure, and violation of his due process rights based on the doctrine of qualified immunity. Defendants also seek summary judgment in their favor on Mr. Fiore's state law abuse of process claim. For the reasons set forth below, Defendants' motion is granted.

**FACTS**[2]

This case arises out of allegations of domestic violence made by Mr. Fiore's wife, Mariemma Fiore, against her husband. Mr. Fiore is a police officer with the Lehigh Valley Airport and the Moore Township Police Department. According to Ms. Fiore, her husband began behaving erratically in February 2007, after she informed him she wanted a divorce. His erratic behavior began to escalate when Ms. Fiore again told him their marriage was over on September 3, 2007. A

---

[1] These Defendants include the Mayor of Bethlehem, the Police Commissioner, the Deputy Police Commissioner, and eleven current or former Bethlehem police officers.

[2] "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

week later, on September 10, 2007, the Fiores had an argument inside their home. Mr. Fiore's yelling during argument caused Ms. Fiore's daughter and two of her male friends who were outside the home at the time to worry Mr. Fiore was going to strike his wife. On September 14, 2007, Jim Cavallo, Mr. Fiore's former chief at the Moore Township Police Department and a family friend, called Ms. Fiore and expressed concern about her husband's behavior, asking whether she believed Mr. Fiore would hurt himself. At Ms. Fiore's recommendation, Cavallo agreed to advise Mr. Fiore to seek counseling.

The Fiores again discussed divorce late in the evening on September 18, 2007, after Mr. Fiore returned home from work. Mr. Fiore became increasingly agitated as the discussion progressed, saying he could not handle the situation, he had nothing, he had lost everything, and he had no family. Eventually, Mr. Fiore "flipped out" and yelled he could not take it anymore. Pl.'s Resp. Ex. I, Statement of Mariemma Fiore, Sept. 20, 2007, 2. Mr. Fiore went out for a cigarette looking "wild-eyed," leaving his wife fearful he would kill himself or her. *Id.*

The following day, while on her way home from work, Ms. Fiore received a call from her daughter, who told her Mr. Fiore was "snapping." *Id.* at 3. As a result, the daughter was avoiding the family's home. By the time Ms. Fiore arrived at home, Mr. Fiore had left for work, but Ms. Fiore's mother, Lydia Lopez, who lived with the Fiores, was there. Lopez told her daughter Mr. Fiore had relayed to her the substance of the couple's discussion the night before and said he could not take it anymore. Mr. Fiore then asked Lopez if she had heard about another police officer who had killed his wife and then killed himself one day earlier.[3] Lopez told Mr. Fiore "it wasn't worth

---

[3] Mr. Fiore was referring to a September 18, 2007, incident involving Derrek Duh, a part-time police officer with the Tatamy Borough Police Department and the Lehigh County Sheriff's Office, who killed his wife and then committed suicide.

2

it." *Id.* Ms. Fiore told her mother she was worried Mr. Fiore was "going to do that to me," and Lopez responded "she was thinking the same." *Id.*

On September 20, 2007, Ms. Fiore met with a marriage counselor, who contacted a crisis hotline on her behalf. Ms. Fiore thereafter went to Bethlehem police headquarters to obtain an emergency Protection from Abuse (PFA) Order against her husband. During an interview with Bethlehem Police Officer Moses Miller, Ms. Fiore said she feared for her life and thought her husband was going to kill her. Ms. Fiore also prepared a handwritten statement describing her husband's explosive behavior in the weeks leading up to September 20, as set forth above.

After speaking with Ms. Fiore and obtaining her written statement, Officer Miller contacted Northampton County Assistant District Attorney Jacqueline Taschner, who was in charge of the domestic violence unit at the time.[4] Taschner came to the police station to interview Ms. Fiore, and, based on the interview, Taschner ordered Officer Miller to charge Mr. Fiore with terroristic threats and harassment. Taschner told Officer Miller they had grounds for the charges based on third-party information (*i.e.*, from Lopez) and relevant case law.

As part of his investigation into these charges, Officer Miller called Lopez to verify what she had said to her daughter. Although Officer Miller only spoke with Lopez briefly,[5] Lopez confirmed that Mr. Fiore had referred to the Tatamy Borough police officer who had killed his wife and then killed himself.

---

[4] Pursuant to Northampton County policy, police officers were required to contact the District Attorney's office for approval before making a domestic violence arrest.

[5] Officer Miller explained the conversation was brief because Ms. Fiore had advised him her mother probably would not want to talk to him in front of Mr. Fiore, who would also be at the Fiores' home. Pl.'s Resp. Ex. H, Miller Dep. 45.

3

At Taschner's direction, Officer Miller prepared a criminal complaint charging Mr. Fiore with terroristic threats and harassment, in violation of Pennsylvania Crimes Code § 2706(a)(1) and § 2709(a)(4), respectively. Officer Miller believed the basis for the charges was that, considering the totality of the circumstances—including Mr. Fiore's increasingly erratic behavior and anger regarding the dissolution of his marriage, which had caused third parties, including his supervisor, to fear he would assault his wife or hurt himself—Mr. Fiore's reference to a murder-suicide by another police officer with domestic problems amounted to an implicit threat to kill Ms. Fiore. Officer Miller also prepared an affidavit of probable cause, which recited that Ms. Fiore had come to police headquarters and stated (1) her husband's behavior had been erratic and explosive; (2) he had made statements that he had nothing to lose and had lost everything; and (3) he referred to a recent incident in which another police officer killed his wife and himself in a conversation with Ms. Fiore's mother. The affidavit also stated Ms. Fiore's mother had told Mr. Fiore "it wasn't worth it" and Ms. Fiore said she feared for her life and the lives of her children. Officer Miller, Taschner, and Ms. Fiore then appeared before a Magisterial District Judge and obtained a PFA order and an arrest warrant for Mr. Fiore.

After Officer Miller obtained the warrant, Lieutenant David Strawn assembled a team of officers—including himself, Officer Miller, and eight others[6]—to execute the warrant. At the Fiores' residence, Lieutenant Strawn, Officer Miller, and another officer approached the front porch while the remaining officers positioned themselves around the perimeter of the residence. Lieutenant Strawn observed Mr. Fiore and his mother-in-law inside the house feeding the Fiores' eight-month-

---

[6] The eight other officers who participated in the arrest—Robert Urban, Louis Csaszar, Ronald Brazinski, Michael Manfredo, Christopher Yerk, Scott Parry, Scott Felchock, and Christopher Beebe—are all Defendants in this action.

4

old daughter. Lieutenant Strawn knocked on the front door and, when Mr. Fiore answered, introduced himself and explained he had a warrant to arrest Mr. Fiore for terroristic threats. Lieutenant Strawn entered the Fiores' home, leaving Officer Miller on the front porch.

With Mr. Fiore present, Lieutenant Strawn asked Lopez about the specific threat Mr. Fiore had made. Lopez told him Mr. Fiore never made any threat against Ms. Fiore, but did talk about the Tatamy Borough police officer who killed his wife and committed suicide, which scared Ms. Fiore. According to Mr. Fiore, Lieutenant Strawn then stated, "if your son-in-law did not make any threat against your daughter, we have no P.C. to arrest him," and went on to explain, "[w]e have no legal grounds to arrest him. We have no legal right to even be here." Pl.'s Resp. Ex. A, Aff. of John Fiore ¶ 27. Lopez responded that Mr. Fiore "never made any threat to [her] concerning [her] daughter," and Lieutenant Strawn remarked, "then what are we doing here?"[7] *Id.* Although Lieutenant Strawn remained in the residence for some period of time before taking Mr. Fiore into custody, he did not contact Taschner (who he knew had approved the charges after speaking with Ms. Fiore personally) or speak with Officer Miller regarding Lopez's most recent statements. Instead, Lieutenant Strawn arrested Mr. Fiore pursuant to the warrant.[8]

---

[7] At his deposition, Lieutenant Strawn did not recall making these comments to Lopez, but acknowledged it was possible he had.

[8] After he returned to headquarters, Lieutenant Strawn called Assistant Chief Jim Cavallo of the Moore Township Police Department, Mr. Fiore's part-time employer, to advise him of the situation, as required under Bethlehem Police Department policy. Mr. Fiore contends Assistant Chief Cavallo told him that, during this conversation, Lieutenant Strawn told Cavallo the case against Mr. Fiore was "bullshit" and the charges should never have been filed and would in all likelihood be dropped in the near future. Pl.'s Resp. Ex. A, Aff. of John Fiore ¶ 46. As Defendants note, however, while Strawn's statement to Cavallo was an admission by a party-opponent, Mr. Fiore's statement regarding Cavallo's account of his conversation with Strawn is hearsay and therefore may not be considered on a motion for summary judgment. *See Smith v. City of Allentown*, 589 F.3d 684, 693-94 (3d Cir. 2009) (upholding a district court's refusal to consider, at the summary judgment stage,

5

Mr. Fiore was transported to Bethlehem police headquarters, where he was arraigned via closed circuit television and given a choice between being placed in a secure mental health facility or being incarcerated in the Northampton County Prison. Fearful for his safety at the prison, which might have housed inmates he had arrested, Mr. Fiore selected the former option and was transported to Muhlenberg Hospital. Following an examination, Mr. Fiore was released the next day.

In 2008, Mr. Fiore's criminal defense attorney contacted Lieutenant Strawn to see whether he would testify for Mr. Fiore at trial. Lieutenant Strawn stated he would testify that, according to his investigation and report, Mr. Fiore never threatened to harm or kill his wife. According to Mr. Fiore's attorney, Lieutenant Strawn also advised him Strawn believed Mr. Fiore should never have been arrested or prosecuted for the charged offenses. On August 18, 2008, the charges against Mr. Fiore were dismissed at the request of the District Attorney for lack of evidence.

In September 2009, Mr. Fiore filed this lawsuit. Following discovery on the issue of qualified immunity, the Defendants filed the instant motion for partial summary judgment as to Mr. Fiore's § 1983 claims for malicious prosecution, false arrest, false imprisonment, illegal search and seizure, and violation of his due process rights, and his Pennsylvania law abuse of process claim.

## DISCUSSION

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine"

---

a plaintiff's testimony regarding a statement a third party made to the plaintiff about a conversation with a defendant).

6

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis has two components: (1) whether the facts, viewed in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right; and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Wright v. City of Phila.*, 409 F.3d 595, 600-01 (3d Cir. 2005). A district court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Defendants argue they are entitled to qualified immunity as to Mr. Fiore's § 1983 claims of malicious prosecution, false arrest, false imprisonment, illegal search and seizure, and violation of his due process rights because Mr. Fiore cannot show his arrest was not supported by probable cause, a necessary element of each of those claims.[9] Defendants further argue that, even if probable cause was lacking, a reasonable police officer would not have known Mr. Fiore's arrest would violate the

---

[9] The parties agree the existence of probable cause is a threshold issue as to each of these claims. In addition, Defendants argue—and Mr. Fiore does not dispute—that because Mr. Fiore's due process claim is based on his arrest and prosecution without probable cause, the claim should be analyzed similarly to his Fourth Amendment claims.

7

Constitution under the circumstances. Defendants also argue that under the Third Circuit's recent decision in *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010), Taschner's approval of the charges against Mr. Fiore gives rise to a presumption of qualified immunity, which Mr. Fiore has not rebutted.[10] Mr. Fiore disputes the existence of probable cause, and argues the Defendants are not entitled to qualified immunity because no reasonably competent, well-trained police officer would have believed Mr. Fiore's reference to the Tatamy officer's murder-suicide constituted a threat. Although Mr. Fiore emphasizes reliance on ADA Taschner's advice was particularly unreasonable once Lopez told Lieutenant Strawn that Mr. Fiore had not made any threat against her daughter, Mr. Fiore also argues such reliance was objectively unreasonable even before this information came to light.

This Court will exercise its discretion pursuant to *Pearson* to first address the second prong of the qualified immunity analysis: whether the constitutional right at issue was clearly established. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Thus, while it has long been clearly established that an arrest may be made only on the basis of probable cause,[11] "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also*

---

[10] Although the Third Circuit did not issue its decision in *Kelly* until after the oral argument on Defendants' partial summary judgment motion, the parties submitted letter briefs addressing the decision and its application to this case.

[11] "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).

8

*Berg v. Cnty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) ("[T]he question is whether 'a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession.'" (quoting *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997)).

In the Third Circuit, "a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause." *Kelly*, 622 F.3d at 255-56. The officer's reliance must be objectively reasonable, however, and the presumption of qualified immunity may be rebutted if the plaintiff shows that, "under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice." *Id.* at 256; *see also Malley v. Briggs*, 475 U.S. 335, 345 (1986) (holding an officer whose request for a warrant allegedly caused an unconstitutional arrest is entitled to qualified immunity unless "a reasonably well-trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant").

"Whether it would have been clear to a reasonable officer that probable cause justified [an] arrest requires an examination of the crime at issue." *Kelly*, 622 F.3d at 256 (citation omitted). "A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to . . . commit any crime of violence with intent to terrorize another." 18 Pa. Cons. Stat. Ann. § 2706(a)(1). "A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person . . . communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures." 18 Pa. Cons. Stat. Ann. § 2709(a)(4). As to the harassment charge, the criminal complaint specified Mr. Fiore was

9

charged with "making verbal threats which did alarm or seriously annoy [Mariemma Fiore] and which served no legitimate purpose." Pl.'s Resp. Ex. E, Criminal Compl.

At the time Mr. Fiore was arrested, it was clearly established that in order to prove the offense of terroristic threats, the evidence had to show (1) "a threat to commit a crime of violence was made"; and (2) "the threat was communicated with the intent to terrorize or with reckless disregard of the risk of causing such terror." *Commonwealth v. Hudgens*, 582 A.2d 1352, 1357 (Pa. Super. Ct. 1990). The threat need not have been communicated directly by the defendant to the victim, but may have been relayed by a third party. *Commonwealth v. Kelley*, 664 A.2d 123, 127 (Pa. Super. Ct. 1995). Moreover, the defendant need not have "specifically articulate[d] the crime of violence which he . . . intend[ed] to commit where the type of crime [could] be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement." *Hudgens*, 582 A.2d at 1358.

Significantly, at the time of Mr. Fiore's arrest, the Pennsylvania Superior Court had held that even ambiguous remarks could amount to a threat where, viewed in context, they could reasonably be interpreted as threatening violence. *Commonwealth v. Campbell*, 625 A.2d 1215, 1219 (Pa. Super. Ct. 1993) (holding that, under the circumstances, a customer's statement to a cashier "when I decide to do this, it will be on her shift and there will be lots go down," accompanied by a hand gesture suggesting a gun pointed at his head, could reasonably be interpreted as a threat to commit suicide and harm the cashier and others in the store); *cf. Johnson v. Knorr*, No. 01-3418, 2003 WL 22657125, at *5-6 (E.D. Pa. Oct. 23, 2003) (holding a probationer's statement to a probation officer that "you need to call someone else out of the back," although susceptible to several reasonable interpretations, could have "created a reasonable apprehension that [the probationer] might cause

10

physical harm to [the probation officer]" under the circumstances, and therefore provided a sufficient basis to arrest the probationer for the offense of terroristic threats).

Here, the theory of Mr. Fiore's criminal liability was that, viewed in context, his reference to the Tatamy officer who killed his wife and then committed suicide was an implicit threat to do the same to Ms. Fiore. According to Ms. Fiore, whom both Officer Miller and Taschner interviewed, Mr. Fiore made the reference after several weeks of increasingly erratic behavior and escalating verbal arguments relating to Ms. Fiore's desire for a divorce. In addition to causing Ms. Fiore to fear for her life, Mr. Fiore's behavior caused others, including his former supervisor, to become concerned he would harm his wife or himself. The night before Mr. Fiore made the remark at issue, the Fiores had an argument about their divorce during which Mr. Fiore "flipped out" and became "wild-eyed," yelling he had lost everything and could not take it anymore. The next day, Mr. Fiore recounted the discussion for Lopez, reiterated that he could not take it anymore, and then asked her if she head heard about the Tatamy officer's murder-suicide. Lopez, in turn, recounted her conversation with Mr. Fiore to Ms. Fiore. According to Ms. Fiore, her husband's comment caused both her and her mother to fear Mr. Fiore was planning to kill her.

In these circumstances, a reasonably competent, well-trained police officer could have believed Mr. Fiore's reference to the Tatamy officer's murder-suicide was an implicit threat to kill Ms. Fiore and there was thus probable cause to arrest Mr. Fiore for terroristic threats and harassment. In light of the Pennsylvania Superior Court's decision in *Campbell*, it would not have been clear to a reasonable officer that probable cause was lacking. Hence, reliance on Taschner's advice was

reasonable at the time the arrest warrant was issued.[12]

Mr. Fiore also argues Officer Miller is not presumptively entitled to qualified immunity under *Kelly* because he failed to properly question Lopez as to the specific threat alleged to have been made by Mr. Fiore. This argument misperceives the prosecution's theory of the case. There is no evidence Ms. Fiore, Officer Miller, or Taschner believed Mr. Fiore made a specific, direct threat to kill his wife. Rather, Ms. Fiore's statement, Officer Miller's report, and the affidavit of probable cause all refer to Mr. Fiore's comment about the Tatamy murder-suicide, a comment which, given the context in which it was made, caused both Ms. Fiore and her mother to fear Mr. Fiore would kill Ms. Fiore. A police officer is "not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8 (3d Cir. 2000). Moreover, Officer Miller testified that Ms. Fiore told him Lopez "probably [would not] want to talk in front of . . . [Mr.] Fiore," Pl.'s Resp. Ex. H, Miller Dep. 45, an entirely plausible consideration in a domestic violence case. In these circumstances, Officer Miller's failure to question Lopez more extensively, after Lopez verified that Mr. Fiore had referred to the Tatamy officer's murder-suicide, does not render the presumption of qualified immunity unavailable.[13]

---

[12] In his Affidavit, Mr. Fiore provides an account of a conversation he had with Lopez on September 20, 2007, about the incident involving the Tatamy officer. Mr. Fiore states the conversation was prompted by a television news story about the incident and asserts he condemned the officer's actions and denounced the manner in which the Borough was handling the incident. Even assuming the conversation Mr. Fiore describes occurred on September 19, 2007, the date of the comment which was the basis for the charges against him, the determination whether an arrest was objectively reasonable must be made "on the basis of the information the officers had available at the time of the arrest, not thereafter." *Orsatti*, 71 F.3d at 486.

[13] Mr. Fiore also suggests Officer Miller interfered with Taschner's discretion concerning the authorization of criminal charges against Mr. Fiore; however, there is no evidence Miller told Tashner anything other than what Ms. Fiore reported in her written statement. To the contrary, the record reflects that after interviewing Ms. Fiore personally, Taschner ordered Officer Miller to file

12

Finally, Mr. Fiore argues any continued reliance on Taschner's advice was objectively unreasonable once Lopez told Lieutenant Strawn that Mr. Fiore had never threatened her daughter. Although Mr. Fiore emphasizes Lieutenant Strawn's apparent belief that probable cause was lacking, Strawn admittedly did not "have all of the facts . . . of what [had] occurred" and was not aware of what information Taschner or Officer Miller had. Pl.'s Resp. Ex. D, Strawn Dep. 61, 72. Lieutenant Strawn did know, however, that Taschner had approved the charges against Mr. Fiore after speaking with Ms. Fiore personally. While Lopez told Lieutenant Strawn that Mr. Fiore had not made any threats against her daughter, Strawn testified it is "common" in cases involving domestic incidents for people involved in the incident to deny anything happened. *Id.* at 67-68. The risk of such denial is increased where, as here, the person involved in a domestic incident is asked to discuss the incident in the defendant's presence. Moreover, Lopez also told Lieutenant Strawn Mr. Fiore kept talking about the Tatamy officer who killed his wife and committed suicide, which scared her daughter. This statement by Lopez is consistent with what she told Officer Miller and with the contents of Ms. Fiore's statement and Officer Miller's written report.

Information which comes to light after an arrest warrant has been issued may be relevant in determining whether reliance on the warrant—or on a prosecutor's legal opinion regarding the validity of the charges—is reasonable under the circumstances. *See Berg*, 219 F.3d at 273 (holding "an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances," including "other information that the officer possesses or to which he has reasonable access, and whether failing to make an immediate arrest creates a public threat or danger of flight"). Under the circumstances presented here, however, the

---

a criminal complaint and told him what the charges should be.

13

information Lopez provided Strawn would not have made it obvious to a reasonably competent, well-trained officer that probable cause did not exist. Although Lieutenant Strawn may have questioned whether a threat was made, he admittedly knew he did not have all the relevant information regarding the probable cause for Mr. Fiore's arrest. Mr. Fiore has therefore failed to rebut Lieutenant Strawn's presumptive entitlement to qualified immunity. *See id.* at 272 (holding because the qualified immunity inquiry is an objective one, "the arresting officer's subjective beliefs about the existence of probable cause are not relevant"); *see also Estrada v. Rhode Island*, 594 F.3d 56, 65 (1st Cir. 2010) (holding a police officer was entitled to qualified immunity on a Fourth Amendment claim, notwithstanding evidence suggesting the officer did not believe he had probable cause, where a reasonable defendant in the officer's circumstances would have believed probable cause existed).

Because Taschner approved the charges against Mr. Fiore after speaking with Ms. Fiore personally, Officer Miller, Lieutenant Strawn, and the other officers involved in Mr. Fiore's arrest are entitled to a presumption of qualified immunity, which Mr. Fiore has failed to rebut. Accordingly, the officers are shielded from liability as to Mr. Fiore's § 1983 claims for malicious prosecution, false arrest, false imprisonment, illegal search and seizure, and violation of his due process rights. Defendants' motion for partial summary judgment is granted as to those claims.

Finally, Defendants argue summary judgment should be granted in their favor as to Mr. Fiore's Pennsylvania law claim for abuse of process because Mr. Fiore has not presented any evidence suggesting the Defendants arrested and prosecuted Mr. Fiore for an illegitimate purpose. Mr. Fiore does not respond to this argument. "[T]o recover under a theory of abuse of process, a plaintiff must show that the defendant used legal process against the plaintiff in a way that

constituted a perversion of that process and caused harm to the plaintiff." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 304 (3d Cir. 2003). A perversion of legal process "occurs when a party uses the process 'primarily to accomplish a purpose for which the process was not designed.'" *Id.* (citation omitted). Because Mr. Fiore has not pointed to any evidence suggesting the Defendants used the criminal process to accomplish an illegitimate purpose, summary judgment is also granted as to this claim.

An appropriate Order follows.

BY THE COURT:

Juan R. Sánchez, J.

15